# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 23-0328V

| | |
|---|---|
| HEIDI FLANAGAN,<br><br>                Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                Respondent. | Chief Special Master Corcoran<br><br>Filed: October 31, 2025 |

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.*

*Joseph Douglas Leavitt, U.S. Department of Justice, Washington, DC, for Respondent.*

### DECISION AWARDING DAMAGES[1]

On March 7, 2023, Heidi Flanagan filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered from Guillain-Barré syndrome ("GBS") following an influenza ("flu") vaccine she received on October 26, 2021. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters, and although entitlement was conceded in Petitioner's favor, the parties could not agree to a damages award.

For the reasons described below, I find that Petitioner is entitled to an award of damages in the amount of $135,000.00 for actual pain and suffering (the sole compensation element at issue)**.**

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

## I.   Relevant Procedural History

Respondent filed his Rule 4(c) Report conceding Petitioner's entitlement to compensation approximately nine months after the claim was filed. ECF No. 19. Thereafter, the parties engaged in discussions regarding damages, but reached an impasse. *See* ECF No. 28.

Petitioner filed a Motion for Ruling on the Record Regarding Damages ("Mot.") on August 26, 2024. ECF No. 29. Respondent filed his response ("Resp.") on October 8, 2024 and Petitioner filed a reply ("Repl.") on October 15, 2024. ECF No. 31-32. I then proposed that the parties be given the opportunity to argue their positions at a "Motions Day" hearing, at which time I would decide the disputed damages issues. ECF. No. 33. That hearing was held on October 24, 2025,[3] and the case is now ripe for a written determination.

## II.   Relevant Facts

### A.   *Medical Records*

Petitioner received a flu vaccine in her left deltoid on October 26, 2021. Ex. 1 at 1. At the time of her vaccination, Petitioner was a new mother to a two-month-old baby, who she was breastfeeding.

On November 9, 2021 (13 days post-vaccination), Petitioner called her doctor to report left-sided facial numbness and tingling in her arms and feet. Ex. 2 at 679. She was instructed to go to the ER, but instead she saw her primary care provider ("PCP") that day. *Id*. at 689. Petitioner was diagnosed with Bells Palsy, started on high dose prednisone, and instructed to follow up in four days. *Id*. at 692.

Petitioner returned to her PCP on November 12, 2021, with continued complaints of tingling in her hands and feet. Ex. 2 at 709-10. She was given a renewed prescription for prednisone and told to follow up if she experienced worsening symptoms or if there was no improvement. *Id*. at 710. She returned to her PCP five days later on November 15, 2021. *Id*. at 723. Her facial palsy had improved, but Petitioner remained concerned about numbness and tingling all over her body. *Id*. at 724. She complained of fatigue and weakness in her legs, and indicated that her symptoms did not occur until after her flu vaccine. *Id*. at 724-25. She asked if she might have GBS. *Id*. During the physical exam,

---

[3] At the end of the hearing held on October 24, 2025, I issued an oral ruling from the bench on damages in this case. That ruling is set forth fully in the transcript from the hearing, which is yet to be filed with the case's docket. The transcript from the hearing is, however, fully incorporated into this Decision.

she had normal strength and reflexes, and no other neurological findings. *Id*. Labs were ordered, and Petitioner was encouraged to see a neurologist for reassurance. *Id*. at 726.

Petitioner had a telehealth follow-up with her PCP on November 22, 2021, during which she reported continuing numbness and tingling in her hands and feet, feeling very weak, and having trouble walking up stairs. Ex. 2 at 778.

Petitioner saw a neurologist on November 30, 2021. Ex. 2 at 786. She reported ascending parethesias since November 5. *Id*. at 787. On exam, she had absent deep tendon reflexes bilaterally, weak hip flexors, and a wide-based unsteady gait. *Id*. at 788. She was sent to the emergency room ("ER") due to suspicion for GBS. *Id*. at 787. The neurologist suggested MRIs of the brain and spine, a lumbar puncture, treatment with IVIG, and an EMG if symptoms did not improve. *Id*.

Petitioner went to the ER the same day. Ex. 2 at 1188. She was admitted to the hospital, had MRIs, and underwent a lumbar puncture that was described as "traumatic after multiple attempts." *Id*. at 1217. She stated that she experienced "horrible nausea and headaches from the spinal tap." Ex. 3 at ¶6. Her MRI results were consistent with neuritis or Bell's Palsy. *Id*. at 1234. She was diagnosed with GBS post-flu vaccine and advised to "avoid future flu vaccines indefinitely." *Id*. at 1205-34, 1242. Petitioner was hospitalized for three days and received three infusions of IVIG. *Id*. at 1248, 1258. Petitioner stated that she was discharged from the hospital early because of her emotional distress at being separated from her newborn son. Ex. 3 at ¶5. She received two additional IVIG infusions as an outpatient treatment after her discharge. *Id*. at 813, 829. On December 3, 2021, she reported 7/10 headache pain and received a Toradol injection (which required her to skip breastfeeding for a day). *Id.* at 813.

Petitioner had a telehealth follow-up appointment with her neurologist on December 22, 2021. Ex. 2 at 868. She reported feeling much better – with some tingling on the palms of her hands and soles of her feet. *Id.* at 869. Her strength had returned and her headaches had resolved. *Id*. The record notes "no rehab needs identified" and an EMG was ordered. *Id.* at 870. The EMG was "nearly normal" with mild findings consistent with a "prior demyelinating polyneuropathy." *Id.* at 898. Petitioner described the EMG as being "zapped many times" which was "as unpleasant as it sounds." Ex. 3 at ¶7.

At an unrelated appointment on January 7, 2022, Petitioner reported feeling "back to normal." Ex. 2 at 878.  During her telehealth follow up on February 22, 2022, Petitioner reported feeling "essentially back to normal" with 100% leg function and some intermittent tingling in her arms. *Id.* at 910.

On April 17, 2022, Petitioner sent a message to her doctor about "still feeling some symptoms" of her GBS. Ex. 2 at 912. She did not seek any further treatment for her GBS, but mentioned "rare episodes of momentary tingling" during a visit with her PCP on April 28, 2023. Ex. 4 at 1-2.

### B. *Witness Testimony*

Petitioner stated in her first affidavit that she had to stop working because her job required her to be on her feet – and that it would be months until she could return. Ex. 3 at ¶4. She also stated that she had to hire help to care for her child because she was "completely physically and emotionally unavailable and unable to tend to them." *Id*. at ¶4.

In her first supplemental affidavit, Petitioner describes ongoing emotional trauma and GBS symptom flare-ups when she was dehydrated. Ex. 5 at ¶4. She described continued difficulty working due to her job requiring her to be on her feet. *Id*. at ¶5.

Petitioner filed a second supplemental affidavit on October 20, 2025, just days prior to the hearing. Ex. 7. In it, she highlighted how being a breastfeeding new mother exacerbated the pain and suffering she experienced during her GBS. For example, she described having to pump breastmilk and throw it away while taking steroids for her Bells Palsy. *Id*. at ¶2. While she was hospitalized for her GBS, she pumped breastmilk that her husband picked up twice daily to take to the baby. *Id*. at ¶7. She chose to forego certain drugs, such as anti-nausea and pain medications, in order to continue breastfeeding safely. *Id*. She described being still "so sick" for her outpatient IVIG infusions, that she was forced to take medications, requiring her again to discard breastmilk. *Id*. at ¶10. She argued that if she had not had a newborn and insisted on going home, her hospitalization and rehab would have taken much longer. *Id.* at ¶9-10. She described how being away from her baby and worried about her prognosis caused her significant anxiety and emotional distress (she called it "devastating"). *Id*. at ¶1, 3, 4, 5, 6, 12.

Petitioner also stated that she still has numbness/tingling in her arms at night and when she wakes in the morning. *Id*. at ¶11.

### III. **The Parties' Arguments**

Petitioner seeks an award of $150,000.00 for her pain and suffering. Mot. at 1. She argues that her vaccine injury was "severe and debilitating" and caused "immense" emotional trauma. *Id.* at 10-11. She highlights that she sought treatment immediately and required several visits to the doctor before diagnosis. *Id*. at 10. Further, Petitioner describes how significantly her GBS impacted her ability to care for her newborn baby, including limiting her ability to breastfeed her son and forcing her to leave the hospital

4

before it was medically recommended due to distress. *Id*. at 11. Finally, Petitioner notes that she continues to experience intermittent symptoms and is unable to receive flu vaccinations in the future. *Id*.

During the hearing and in her brief, Petitioner discussed prior GBS cases that involved injured claimants with awards ranging from $160,000.00 to $163,000.00, and argued that an award of $150,000.00 in pain and suffering was reasonable and appropriate in comparison. Mot. at 12-15.

### a. Respondent

Respondent proposes an award of $70,000.00 for Petitioner's pain and suffering. Resp. at 1. He argues that Petitioner experienced "an unusually mild clinical course of GBS," with only three days in the hospital, five IVIG infusions, one lumbar puncture, and a prescription for prednisone. *Id*. at 7. He further notes that she was "largely recovered" four months after vaccination, with minor intermittent symptoms for up to 18 months. *Id*.

Respondent also distinguishes Petitioner's cited cases, noting that all of them had longer treatment courses and more treatment, specifically physical therapy. Resp. at 7-11. Respondent discussed two prior GBS cases with awards ranging from $70,000.00 (plus an additional $27,000.00 for that claimant's Bells Palsy) to $92,000.00. *Id*. at 12-13.

### IV.   Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594,

at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by a Court of Federal Claims decision several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). *Graves* maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 595. Under this approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards – and properly emphasizes the importance in each case of basing damages on the specific injured party's circumstances.

6

**V.     Prior SPU Compensation of GBS Pain and Suffering**[4]

**A.     Data Regarding Compensation in SPU Flu/ GBS Cases**

Flu/GBS cases have an extensive history of informal resolution within the SPU. As of January 1, 2025, since SPU's inception ten years ago, 897 GBS cases have been resolved. Compensation has been awarded in the vast majority of cases (852), with the remaining 45 cases dismissed.

The data for all categories of theses damages decisions reflect the expected differences in outcome, summarized as follows:

|  | **Damages Decisions by Special Master** | **Proffered Damages** | **Stipulated Damages** | **Stipulated Agreement**[5] |
|---|---|---|---|---|
| **Total Cases** | *56* | *412* | *20* | *364* |
| **Lowest** | $96,008.66 | $9,050.40 | $20,000.00 | $3,098.64 |
| **1st Quartile** | $156,760.64 | $125,000.00 | $128,700.00 | $100,000.00 |
| **Median** | **$171,082.15** | **$162,940.13** | **$224,397.27** | **$150,000.00** |
| **3rd Quartile** | $186,457.51 | $244,193.98 | $380,028.33 | $221,250.00 |
| **Largest** | $244,390.18 | $2,282,465.84 | $985,000.00 | $1,200,000.00 |

**B.     Adjudication Specifically of GBS Pain and Suffering**

Only a small minority of cases have involved a special master's adjudication of damages issues. The written decisions setting forth such determinations provide the most reliable guidance in deciding what similarly-situated claimants should also receive.[6]

---

[4] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of GBS claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

[5] One award was for an annuity only, the exact amount which was not determined at the time of judgment.

[6] Of course, even though *all* independently-settled damages issues (whether by stipulation/settlement or proffer) must still be approved by a special master, such determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

As of January 1, 2025, in nearly every occasion that SPU has had to resolve the appropriate award for GBS pain and suffering, over $100,000.00 has been awarded (with a lower sum, lower sum, $92,500.00, only awarded once). The remaining fifty-five (55) awards far exceeded $100,000.00. The first-quartile value is $153,750.00. The median is $167,500.00. The third-quartile value is $178,500.00. The largest award was $197,500.00.

These decisions are informed by what is known about GBS, including its description as set forth in the Vaccine Injury Table ("Table"). Pursuant to the Table, vaccine causation is presumed for GBS with an onset 3 – 42 days (not less than 3 days, and not more than 42 days) after receipt of a seasonal flu vaccine. 42 C.F.R. § 100.3(a)(XIV)(D). The Qualifications and Aids to Interpretation ("QAI") explain:

> GBS is an acute monophasic peripheral neuropathy that encompasses a spectrum of four clinicopathological subtypes… The interval between the first appearance of symptoms and the nadir of weakness is between 12 hours and 28 days. This is followed in all subtypes by a clinical plateau with stabilization at the nadir of symptoms, or subsequent improvement without significant relapse. Death may occur without a clinical plateau. Treatment-related fluctuations in all subtypes of GBS can occur within 9 weeks of GBS symptom onset, and recurrence of symptoms after this timeframe would not be consistent with GBS.

42 C.F.R. § 100.3(c)(15)(I) (2017). The three most common subtypes are acute inflammatory demyelinating polyneuropathy ("AIDP"); acute motor axonal neuropathy ("AMAN"); and acute motor and sensory neuropathy ("AMSAN"). Id. The onset of each is marked by "bilateral flaccid limb weakness and decreased or absent deep tendon reflexes in weak limbs." Id. at (c)(15)(II). The fourth subtype – Fisher syndrome or Miller-Fisher syndrome – has a different onset of "bilateral ophthalmoparesis; bilateral reduced or absent tendon reflexes; [and] ataxia." *Id.* at (c)(15)(III).[7]

A consistent starting consideration is that "GBS pain and suffering awards generally should be higher than those awarded to petitioners who have suffered a less frightening and physically alarming injury, such as SIRVA."[8] *Gross v. Sec'y of Health &*

---

[7] *See also National Vaccine Injury Compensation Program: Revisions to the Vaccine Injury Table – Notice of Proposed Rulemaking*, 80 Fed. Reg. 45132, at 45144 – 45 (July 29, 2015) (proposing addition of Table flu/GBS claims – explaining GBS is "an acute paralysis caused by dysfunction in the peripheral nervous system [that…] may manifest with weakness, abnormal sensations, and/or abnormality in the autonomic (involuntary) nervous system," and that death, when it occurs, is most often related to respiratory failure).

[8] Shoulder injury related to vaccine administration ("SIRVA") is another Table injury. 42 C.F.R. §§ 100.3(a), (c)(10).

*Hum. Servs.*, No. 19-0835V, 2021 WL 2666685, at *5 (Fed. Cl. Spec. Mstr. March 11, 2021); *see also, e.g.*, *Castellanos v. Sec'y of Health & Hum. Servs.*, No. 19-1710V, 2022 WL 1482497, at *10 (Fed. Cl. Spec. Mstr. Mar. 30, 2022) (emphasizing recognition of "the seriousness of GBS as a general matter," in awarding a six-figure sum); *Voeller v. Sec'y of Health & Hum. Servs.*, No. 20-1526V, 2023 WL 5019830, at *10 (Fed. Cl. Spec. Mstr. July 6, 2023) (noting GBS's "frightening" nature).

But of course, not every GBS case is equally severe. Further details of the initial medical course are considered – including any mistake or delay in diagnosing GBS; any in-patient hospitalization and/or in-patient rehabilitation (and the duration of any such stays); diagnostic procedures (e.g., bloodwork, lumbar punctures, electrodiagnostic studies, imaging); the severity of symptoms at their nadir (e.g., involving incontinence or respiratory failure); the extent and effectiveness of treatment (e.g., IVIg, plasmapheresis, pain medications); other interventions (e.g., feeding tubes, breathing tubes, catheterization); and any complications (e.g., sepsis during hospitalization).

Also relevant is the long-term course – as evidenced by out-patient therapies, neurology evaluations, and other medical appointments concerning GBS; the results of repeat electrodiagnostic studies and other relevant tests; medical providers' assessments of the degree of recovery achieved; ongoing reliance on assistive devices and medications; and relevant treatment gaps. Previous opinions have recognized that "a substantial recovery does not mean that [an individual] has fully recovered from his GBS and has no ongoing sequelae. It is common for petitioners to experience ongoing symptoms of GBS, such as numbness and fatigue, even with a good recovery." *Elenteny v. Sec'y of Health & Hum. Servs.*, No. 19-1972V, 2023 WL 2447498, at *5 (Fed. Cl. Spec. Mstr. Mar. 10, 2023). But symptoms of that nature are typically folded into a "typical" past pain and suffering award, and will not justify a future component. *See, e.g.*, *id.*; *Miller v. Sec'y of Health & Hum. Servs.*, No. 21-1559V, 2023 WL 2474322, at *8 (Fed. Cl. Spec. Mstr. Feb. 10, 2023).

"The mere fact that a claimant had pre-vaccination comorbidities does not *per se* diminish the impact of [the vaccine injury] on his life – especially one as alarming and potentially life-altering as GBS – and therefore is not alone reason for a lower award." *Bircheat v. Sec'y of Health & Hum. Servs.*, No. 19-1088V, 2021 WL 3026880, at *4 (Fed. Cl. Spec. Mstr. June 16, 2021). However, a special master is statutorily required to consider to what extent a petitioner's pain and suffering is truly "*from* the vaccine-related injury," Section 15(a)(4) (emphasis added), and not from any unrelated preexisting or subsequently-developed medical issues. *See, e.g.*, *Bircheat*, 2021 WL 3026880, at *4; *Gross*, 2021 WL 2666685, at *5.

Also worthy of consideration are the injury's impact on a petitioner's personal circumstances including his or her family and other personal obligations, and professional life (whether or not lost wages are directly claimed).

All of these facts are primarily gleaned from the medical records – although sworn statements and/or other evidence may also be considered, especially if they *supplement*, and do not contradict, the facts reflected in the medical records.

### VI.    Appropriate Compensation for Petitioner's Pain and Suffering

When performing this analysis, I review the entire record, including the medical records and affidavits filed and all assertions made by the parties in written documents and during oral argument. I also consider prior awards for pain and suffering in prior GBS cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

In this case, there is no dispute of the Petitioner's awareness of her GBS experience. The parties also do not dispute the treatment Petitioner received: a three-day hospitalization, prescription prednisone to treat Bells Palsy, several visits with her PCP before diagnosis, a lumbar puncture, MRIs, five IVIG infusions, one inpatient physical therapy evaluation, an EMG, and outpatient neurological follow-up care. However, Petitioner focuses heavily on Petitioner's experience, both physical and emotional, during treatment, while Respondent focuses solely on medical treatment provided.

Respondent does not discuss Petitioner's affidavit testimony, nor any references to her child or breastfeeding in the medical records, in his analysis of pain and suffering – and seemingly bases his proposal solely on Petitioner's three-day hospital stay, five IVIG infusions, one lumbar puncture, prednisone prescription, and substantial recovery within four months.[9] *See* Resp. at 7. And in fact, Respondent states that "Petitioner did not undergo a traumatic lumbar puncture," when distinguishing a cited case – when Petitioner did suffer a traumatic lumbar puncture as evidenced by the medical record. Resp. at 8; Ex. 2 at 1217. Although Respondent is correct that some GBS injuries are comparatively mild and justify a lower pain and suffering award, in this case, Respondent's proposed award does not sufficiently account for Ms. Flanagan's experience.

Overall, Petitioner experienced a mild GBS injury that required treatment commonly seen in such cases, including hospitalization, a lumbar puncture, treatment

---

[9] Respondent acknowledged during oral arguments that a claimant's emotional distress is a proper consideration in determining a pain and suffering award.

with IVIG, and an EMG. Although Petitioner did not require substantial therapies after she was discharged form the hospital, there were factors unique to her that made her injury particularly difficult to endure. For example, there was trouble reaching a diagnosis – requiring several visits with her PCP, along with an early diagnosis of Bells Palsy. She experienced a lumbar puncture that was "traumatic after several tries" and caused headaches for days afterwards, as well as a painful EMG. Finally, Petitioner was the mother of a newborn baby, who she was breastfeeding at the time. She was required to be away from her baby during her hospitalization and was forced to choose whether to take certain recommended medications (that would likely have relieved some of her discomfort) or to discard her breastmilk. There is support in the medical records, along with Petitioner's statements, regarding her choice. *See e.g.*, Ex. 2 at 813, 827, 1252.

Both parties cited prior GBS cases in their briefing that are helpful in determining the appropriate award in this case. Generally, the cases cited by Petitioner involved claimants who required substantial physical therapy for a long duration after treatment with IVIG, which was not Petitioner's experience. *See Longo v. HHS*, No. 21-844V, 2023 WL 9326039 (Fed. Cl. Spec. Mstr. Dec. 20, 2023; *Weidner v. HHS*, No. 21-1554V, 2023 WL 8110729 (Fed. Cl. Spec. Mstr. Oct. 13, 2023); *Vallee Estate of Vallee v. HHS*, No. 20-1381V, 2023 WL 5559174 (Fed. Cl. Spec. Mstr. July 27, 2023); *Robinson v. HHS*, No. 18-88V, 2020 WL 5820967 (Fed. Cl. Spec. Mstr. Aug. 27, 2020).

The cases cited by Respondent involve claimants with treatment courses more factually similar to Petitioner's, but without the same kind of difficult personal circumstances. *See Koonce v. HHS*, No. 21-1560V, 2024 WL 3567368 (Fed. Cl. Spec. Mstr. July 8, 2024); *Granville v. HHS*, No. 21-2098V, 2023 WL 6441388 (Fed. Cl. Spec. Mstr. Aug. 30, 2023). In *Koonce*, the claimant was awarded $70,000.00 in pain and suffering for his GBS after being hospitalized for four days, having a lumbar puncture, and receiving four IVIG treatments. *Koonce*, 2024 WL 3567368 at *1. He was discharged from the hospital early due to rapid recovery. *Id*. But - he received a separate $27,000 pain and suffering award for his Bells Palsy, which Petitioner also experienced. *Id*. at 5. The *Granville* petitioner received $92,000.00 in pain and suffering following a five-day hospital stay, five IVIG infusions, and seven sessions of physical and occupational therapy. *Granville*, 2023 WL 6441388 at *1-3. She experienced minor residual symptoms for only seven months. *Id*. But although Petitioner had similar treatment to those claimants, neither experienced the same circumstances during treatment as did Petitioner as a new mother with a breastfeeding infant. Thus, the appropriate award should be somewhat higher than was awarded therein.

Overall, considering the arguments presented by both parties at the hearing, a review of the cited cases, and based on the record as a whole, I find that **$135,000.00** in

compensation for past pain and suffering is reasonable and appropriate to account for Petitioner's personal circumstances during her overall mild course of GBS.

## Conclusion

In light of all of the above, the I award **I award Petitioner a lump sum payment of $<u>135,000.00</u> for her pain and suffering to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a) of the Vaccine Act. *Id*.

The Clerk of Court is directed to enter judgment in accordance with this Decision.[10]

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master

---

[10] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.